***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Phillips. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Phillips with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff, Loy Buff, is properly before the Industrial Commission, pursuant to N.C. Gen. Stat. §143-166.1, et al., and the Office of the Attorney General for the State of North Carolina is appearingamicus curiae.
 2. All parties have been correctly designated, andthere is no question as to mis-joinder or non-joinder orparties.
 3. The decedent, Davina Buff Jones, hereinafter"decedent", was employed as a law enforcement officerwith the Village of Bald Head Island at the time of herdeath, on October 22, 1999.
 4. The decedent died as a result of a gunshot wound tothe head.
 5. Plaintiff's issues for determination are as follows:
 a. Whether decedent's estate is entitled to deathbenefits, pursuant to N.C. Gen. Stat. § 143-166.1,et al.
6. Defendant's issues for determination are as follows:
a. Whether decedent's estate is entitled to death benefits, pursuant to N.C. Gen. Stat. § 143-166.1y,et al.; and
b. Whether decedent was killed in the line of duty while performing her official duties, pursuant to N.C. Gen. Stat. § 143-166.1, et al.
7. A pre-trial agreement was executed and submitted at the time of hearing. The parties stipulate to the admissibility of the following exhibits:
a. SBI files and FBI lab reports, but not including SBI reports of interviews with witnesses.
b. Maps, diagrams and photographs contained in the FBI reports, in the Bald Head Island investigative reports and the Monty Clark investigative files.
c. Transcript of 911-communication tape.
d. Audio tape recording of 911 communications calls.
f. All records from medical and mental health providers, including but not limited to the following:
i. Dr. Reschley
ii. Dr. Berman
iii. Dr. Rollins
iv. Wayne County Mental Health
v. Medical Examiner's report and records, death certificates and amendments, and autopsy reports and records
g. Hand-written notes by decedent, upon proper identification of handwriting.
h. Plaintiff's Glock 40-caliber handgun.
i. Daily crime scene log/report with right to depose author.
j. Plaintiff's personnel documents and file.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of her death on October 22, 1999, the decedent was employed by the Village of Bald Head Island as a full time police officer. She was initially employed January 18, 1999. As a condition of employment, decedent underwent a medical examination and a psychological evaluation and was found to be in good health, physically and mentally.
2. Decedent's assigned duties as a general patrol officer were to patrol the island, respond to any calls for assistance by the police, fire or EMS, respond to and take various police incident reports, and investigate any suspicious activities including watching for persons who are involved in criminal activity.
3. On October 22, 1999, decedent's duty hours were 6:30 p.m. until 6:30 a.m. the following day. During those duty hours and while on patrol, decedent received a fatal gunshot wound to the center of the back of her skull with the bullet traveling in a forward, upward and slightly left trajectory. Her body was found in the general vicinity of the lighthouse, post office, village hall and church between 11:00 p.m. and midnight in an unlighted and uninhabited area.
4. On the day of the decedent's death, she was partnered with Keith Ray Cane, another Bald Head Island police patrol officer, who was her senior and in charge. They had traveled to Bald Head Island on the ferry from the mainland to start their shift on the 6:00 p.m. boat.
5. While on a meal break during their shift, the officers received a call regarding a missing golf cart at the River Pilot Café at the marina. They took two (2) vehicles, Officer Cane driving a Blazer and decedent driving a Ford Ranger pickup truck to the River Pilot Café. At the River Pilot Café they were unable to determine who had made the call or any of the circumstances surrounding it. They then left and went to the lighthouse where they had seen a golf cart earlier. Officer Cane and decedent found the golf cart and got its registration number to run at the police station in the computer databank.
6. On arriving back at the police station, Officer Cane continued his meal. Decedent proceeded to the computer to check on the golf cart's registration. Decedent also told Officer Cane that she was using the computer to update her resume. After decedent's death, during the investigation, no inquiries were made to determine what decedent learned, reviewed or entered into the computer. The ownership of the golf cart remains unknown and the aerial photographs taken by law enforcement do indicate a golf cart in close proximity to the location where decedent's Ford pickup truck was found.
7. While Officer Cane was finishing his meal and decedent was on the computer, decedent advised that she was going to go for a ride but did not reveal her destination. Officer Cane heard a radio transmission from decedent indicating she was out with three (3) subjects. He immediately started towards the door to join her as backup. He proceeded directly to the Blazer, which was twenty-five or thirty feet from the police department. He then heard a radio transmission from decedent stating, "no need for a gun here on Bald Head Island." Officer Cane attempted to locate her and central communications attempted contact with decedent. He called central communications and was advised that she had reported that she was out with three (3) subjects, her radio keyed up that she told someone there was no need for a gun and to put the gun down.
8. Officer Cane searched and was initially unable to locate decedent. He then noticed some taillights up by the lighthouse in an unlighted area with vegetation all around and where activity does not normally take place in the cul-de-sac. There is a path that leads from the end of the cul-de-sac back to the road to the marina. Officer Cane went to investigate the lights.
9. Decedent's pickup was found backed up in the cul-de-sac with the parking lights on and the motor running. Officer Cane attempted to locate decedent. He found the lighthouse door open. Decedent's flashlight was lying on the seat of the truck, which was not her custom. Decedent's body was lying behind a trash pile. Officer Cane found blood. Decedent's body was face down with her head turned to the left, eyes partially open and lying parallel to a picket fence. Her body was stretched out with her head towards the end of the cul-de-sac and her feet back towards the truck.
10. Officer Cane checked decedent's vital signs, found no pulse in the left wrist and found no sign of breathing. Officer Cane is a medical responder trained to determine vital signs.
11. Officer Cane then returned to the truck and called for backup. Chief Kent Brown, the fire and EMS chief, responded with his wife. Officer Cane advised that he found no pulse or breathing when checking the Decedent. Chief Brown did not check the body but called paramedics who did not verify Officer Cane's findings. Decedent's body was moved and taken down to the ambulance, which proceeded to the marina.
12. When Officer Cane first came upon decedent's body, he found her gun unholstered and lying on the ground under her right hand, not grasped in her hand.
13. The ambulance used to transport decedent's body, was then used to transport people back and forth from the marina including deputy sheriffs and Officer Cane. Prior to the arrival of any sheriff's deputies, Officer Cane moved decedent's gun from where he found it to between his vehicle and Chief Brown's vehicle, laid it on the ground and then after Chief Brown left, he put it in his Blazer. Officer Cane testified that he moved the gun to secure the area because of the possibility of another shooter being in the area.
14. Officer Cane opined that the second transmission by decedent was made from her shoulder-mounted radio in close proximity to her truck.
15. Karen Grasty was the chief of police at Bald Head Island on October 22, 1999. She was out on disability leave but was notified of Decedent's death. On being notified she immediately went to Bald Head Island. When she arrived at the ferry landing she was told by Brunswick County Sheriff, Ronald Hewett, that the body was at the ferry dock. It had been moved there by Bald Head Island personnel and left uncovered on the dock. Sheriff's department personnel then moved the body into the ferry dock office. Sheriff Hewitt stated that the whole crime scene had been moved. Chief Grasty observed the body. Decedent's shoes were on but her hands had not been bagged. She wore bicycle gloves with the ends of the fingers cut out.
16. After securing the ambulance that was being used by Bald Head Island personnel to transport law enforcement officers to the location where Decedent's body was found, Chief Grasty proceeded to the crime scene.
17. The area where decedent's body was found is accessible not only by road, but by a dock to the navigable creek and a cart path through the end of the fence at the cul-de-sac that goes to the road leading to the marina.
18. The evidence indicated that there were drag marks from the back of decedent's pickup truck towards the pool of blood. When Chief Grasty arrived, she found tape around this scene and asked that it be enlarged to include the area through the golf cart path at the end of the cul-de-sac and down both roads past where the ambulance had been parked.
19. There were blood spatters back from the pool of blood towards the drag marks. No blood spatter analysis was made. When Chief Grasty left Bald Head Island to go to a press conference, she left instructions that the scene be preserved but when she returned she found the police tape was down and the Bald Head Island Fire Department was called in to hose down the scene with a fire hose and wash the blood from same. Since the crime scene was compromised, no further investigation could be conducted on the blood spatters or drag marks.
20. The cul-de-sac where decedent's body was found runs east and west. The chapel, lighthouse, and lighthouse museum are north of this road. There is a sidewalk on the north side of this road that does not extend all the way into the cul-de-sac. There is a white wooden picket rail fence on the north side of the cul-de-sac with an opening in it at the approximate location of the pool of blood. There is a fence at the west end of the cul-de-sac. It has an opening in it which accommodates a golf cart path leading to the marina.
21. The Brunswick County Sheriff's Department took gunshot residue wipings of both decedent and Officer Cane on Bald Head Island that night. In addition, gunshot residue wipings were taken of three (3) individuals who landed a boat without lights at the Fort Fisher boat landing. The results of these five (5) gunshot residue wipings indicate that barium, antimony and lead, indicative of gunshot residue were not present in significant concentrations on the hand wiping submitted. It is noted, however, that this does not eliminate the possibility that the subject could have fired a gun. Gunshot residue examinations were also made on decedent's portable police radio, decedent's right-hand glove and decedent's left-hand glove. No particles characteristic of gunshot residue were found on the portable police radio or the left-hand glove. Particles characteristic to gunshot residue were found on the back of the right-hand glove that "could have originated from discharging a firearm, handling a firearm, or by being in close proximity to a firearm when it was discharged."
22. Decedent's shirt and trousers were submitted to the SBI lab for examination and analyses. No gunshot residue was found on decedent's shirt. The right knee of her trousers were scuffed and showed the presence of mineral material imbedded in the fabric of the trousers as well as abrasions on the fabric itself. No examination or analysis was made of her shoes to determine whether or not material on the toes of the shoes consistent with the scuffmarks leading from the back of her truck to the pool of blood.
23. An examination of her weapon for fingerprints revealed none. There were photographs of blood on the back of one of the vehicles but no evidence was presented as to the vehicle in question. Further, no evidence was presented that the blood on the back of the vehicle was ever examined or analyzed.
24. A spent shell casing fired by decedent's gun was found between two of the pickets in the white picket fence north of the pool of blood. The different photographs of the spent shell casing show an altered orientation or location from one photograph to the other. Decedent's body was moved from where it was found. Decedent's gun was moved from where it was found. Both were moved before their positions were documented and photographed. The spent shell casing was moved without documentation as to its orientation when found. The Commissions finds that the crime scene was contaminated when this evidence was moved.
25. Decedent was four (4) feet eleven (11) inches tall and weighed ninety pounds. She was deaf in her right ear. There are conflicting opinions as to whether or not she could have pulled the trigger and positioned the pistol she carried to achieve the path the projectile took from the mid line of the back of her head, forward, upward and slightly to the left. There are also conflicting opinions by those who opined she committed suicide as to the orientation of the weapon and whether or not she used one hand or two to hold the weapon. Deputy Commissioner Phillips indicated in her Opinion and Award that the witnesses asked to demonstrate the possible position of decedent and her service weapon, showed strained maneuvering. The greater weight of the evidence indicates that decedent did not hold her pistol behind her head with one hand or two to achieve the path the projectile took from the mid line of the back of her head, forward, upward and slightly to the left or that of the spent shell casing.
26. The photographs of decedent show a wound on decedent's right forearm on the inside of the wrist. This wound is not consistent with defendant's reasoning that decedent was holding her gun in her right hand while shooting. The wound appears to be caused by the shell casing coming out of her weapon.
27. Where a shell casing is ejected from a weapon such as decedent's depends upon the position of the shooter and how the weapon is held. The Full Commission finds that without the body or a photograph of it as it was found at the crime scene, it is not possible to determine the location of decedent at the time of the fatal shot. The Full Commission finds that when decedent's body was moved and its exact location undocumented prior to it being moved; and decedent's gun was moved and its exact location unknown, then the location of decedent at the time she was shot, the orientation of her body and where the shell casing would eject, are speculative.
28. Decedent finished basic law enforcement training in December of 1998 and her first job was with the Village of Bald Head Island. Although several complaints were made regarding decedent's actions as a new police office, both the chief and assistant chief evaluated decedent as eager to learn, and experiencing problems consistent with beginning a career in law enforcement. Both indicated that decedent would have eventually made a fine officer.
29. Decedent had been married and divorced twice prior to her death. She had no children or persons dependent on her for support. She is survived by two adult sisters and her mother and father. From 1994 to 1998, Decedent was treated at Wayne County Mental Health for adjustment disorder with mixed emotional features and chronic depression. From December 1998 to July or August 1999 decedent had been in an intimate relationship with another police officer which continued until shortly before her death. During the week of her death, decedent attempted to resume their relationship. On the evening of her death, decedent had three (3) telephone conversations with this former boyfriend, the last being at 11:19 p.m. at which time she told him she always wanted them to be friends no matter what had happened in the past and she still wanted to be friends expressing no desire to get back together and told him she would talk to him later. In his opinion, "he could not see Decedent killing herself."
30. Prior to her death, decedent had filed a sexual harassment claim against an emergency medical services technician for Bald Head Island and was angry and dissatisfied about the way that her claim had been handled.
31. Another witness, Hewitt, testified that he told an SBI agent that he thought decedent had committed suicide. This witness stated he formed his opinion because he overheard other officers saying that when he arrived at the Bald Head Island dock and because earlier in the week decedent had said she was upset. When asked of this witness to state his opinion in court as to whether decedent committed suicide, he could not give a definitive answer.
32. Laura Ann Atkins who now lives in Fort Worth, Texas, was decedent's best friend. They talked on the telephone at least three (3) times per week and decedent wrote her letters. They talked to each other about their most personal thoughts and situations. She talked to decedent twice on the date of her death. The first time was because Ms. Atkins had bronchitis and had not seen the doctor. Ms. Atkins called Decedent for advice, decedent advised her to drink hot tea, see the doctor and to later call decedent to tell her what the doctor said. Decedent's mood during those two (2) telephone conversations demonstrated good spirits. Decedent was not morose or gloomy, was not dysthoric or anxious and did not express hopelessness. Ms. Atkins is of the opinion that decedent did not commit suicide.
33. Decedent had two (2) shepherd dogs that she loved very much. Prior to her death, decedent had someone, with whom she had shared residence with, let the dogs out at night. On the day of her death decedent and Laura Atkins discussed on the telephone, a way to rig the back door so that the dogs could go in and out and observers could not tell whether or not the door was open. The morning after her death, decedent's father and mother accompanied SBI Agent Janet Storms to her home to secure the dogs and for Agent Storms to search the house. Decedent wrote in journals almost everything she did, was going to do or intended to do. These journals are not part of the investigative reports. A note on decedent's dining room table indicated items she needed to buy October 23, the day after her death, when her shift ended. The note included heartworm pills for her dogs and prescriptions for herself from the pharmacy. The note indicated that decedent planned to pick up these items on October 23.
34. Dr. Keith C. Reschley was decedent's family doctor, and began treating her in 1997. In 1999 Dr. Reschley started treating decedent for depression. Her last visit was on October 20, 1999. One week prior to that visit, decedent had a suicidal thought where her plan was to walk into the ocean and swim out until she couldn't swim anymore. She did not act on that. He referred her to a psychiatrist on October 20, 1999 but in his opinion she did not have a strong enough suicidal risk to warrant hospitalization because at that visit she did not have suicide ideation. Dr. Reschley made a verbal contract with decedent if she did develop suicide ideations, she would contact him immediately. Dr. Reschley stated that decedent had a reason not to commit suicide because she had no one to take care of her dogs and the suicide ideation about jumping in the ocean and swimming out to sea was not that lethal of an ideation. Dr. Reschley opined that someone planning to commit suicide would not make out a list of things to do the next day. On October 20, 1999, decedent was, in Dr. Reschley's opinion, at low-risk for suicide.
35. None of decedent's medical records nor her psychological records indicate any prior suicide attempts.
36. Dr. C. L. Garrett, a board certified pathologist, is employed by Coastal Pathology Associates and is the medical examiner for Onslow and Jones Counties, North Carolina. He performed an autopsy on decedent and in his opinion the cause of decedent's death was a gunshot wound to the head. His report stated the entrance wound was in the middle of the back of her head, 4½ inches from the top of her head with the bullet traveling forward and upward and slightly to the left. In his opinion, decedent put the gun to the back of her head using two (2) hands and pulled the trigger with her thumb. Dr. Garrett did not notice that the right knee of her trousers was scuffed and contained organic material. Dr. Garrett acknowledged that the drawing that he made of the tears around the gunshot wound were incorrect and did not match the photographs. Dr. Garrett stated there was absolutely no evidence of any injury to the external surface of the body except the gunshot wound. Dr. Garrett did not see the wound to the right inside of Decedent's wrist that is depicted in the photos. Dr. Garrett's opinion for suicide is based on the following:
 • 99.9% of the hard contact gunshot wounds to the head that he has seen were suicidal;
 • Decedent had a history of depression, suicidal ideation and had talked freely with her doctor about thoughts of suicide;
 • She was suddenly in a good mood on the day she died and depressed patients who get in a good mood have figured out a solution to their problem and it's suicide;
 • She had blood on both her gloves and her weapon is right beside her;
 • There is no sign of a struggle or indication any crime was committed; and
 • There were no other suspects. Dr. Garrett acknowledges that the back of the head is an unusual place to have a self-inflicted gunshot wound and that the most numerous location of self-inflicted gunshot is in the temple.
37. Dr. John B. Butts, the chief medical examiner of the State of North Carolina since 1987, is a board certified pathologist. He was not the reviewing medical examiner in this matter which was performed by Dr. Karen Chancellor. Dr. Butts' knowledge of the facts of the case are what he has either read or someone has told him and he was unaware that there was a wound to the inside right wrist of decedent. His opinion of suicide was based on his review of the autopsy and his general understanding of circumstances surrounding her death including that she was found out alone with a contact gunshot wound to the back of her head and her own discharged firearm basically either in her hand or adjacent to her hand and the inquiry conducted by law enforcement which produced no truly credible evidence for the actions of another party.
38. Dr. Robert Leroy Rollins, Jr., a forensic psychiatrist who was director of forensic psychiatry at Dix Hill from 1972 until 2002 and is presently in private practice, testified that he had preformed a psychological autopsy on decedent in order to give an opinion regarding whether she committed suicide. He did this in 2002 and based it on information from the SBI report, the autopsy and the Village of Bald Head Island investigative file. He also had a psychological autopsy performed by Dr. Berman. Dr. Rollins was of the opinion that decedent had a moderate overall risk of suicide and that she did in fact commit suicide. Dr. Rollins' opinion is partially based on the narrative report in the SBI file, however, he did not have any follow-up contact with Dr. Reschley or any of the other persons who gave reports to the police or with her parents or any of the people who saw decedent the day of her death or the week prior to her death.
39. Dr. Alan L. Berman of Washington, DC, was employed by decedent's family to perform a psychological autopsy. He is a clinical psychologist who specializes in suicidology and is the executive director of the American Association of Suicidology. Suicidology is the specific study of suicide and the application of that study to working with suicidal patients, employing certain techniques to better understand the suicide condition, working in the arena of suicide prevention, and a range of other activities having to do with people at risk of suicide. A psychological autopsy involves a range of activities including reviewing archival documents about the individual, records pertaining to employment, education, psychiatric history, medical history and interviews with key informants who can well describe both the individual life and character and in particular the last days of the individual's life where the goal is to best determine what, if any, risk factors were present for suicide or alternative degree of the information which may determine the death is something other than suicide. Dr. Berman performed a psychological autopsy on decedent, interviewing informants face-to-face and one by telephone. It was Dr. Berman's opinion that the manner of decedent's death is best classified as undetermined. He found no motive for a planned suicide and no evidence of impulsive behavior or that she was of impulsive character. He disagrees with Dr. Garrett's reasoning that decedent's upbeat mood on the day of her death was because she had made up her mind to kill herself, indicating that there is no research data to support that line of reasoning. Dr. Berman opined that the shopping list found at decedent's house was of significance because it indicated the importance of her dogs to her, refers to items she is going to pick up the day after her death and speaks to decedent looking ahead which she would not do if she were planning her death. Decedent, in his opinion, had chronic risk of suicide as opposed to acute risk. Dr. Berman came up with thirteen arguments against suicide as follows:
a. Decedent had suffered similar losses and stresses throughout her life. Although they affected her, she was able to cope with each and every one before.
b. Although she had prior instances of prior suicidal thoughts, almost all were expressed without serious intent and in an off-handed way. Most importantly, she had no prior suicidal behavior, particularly in situations similar to those occurring in her final weeks of life.
c. She allegedly kept an active journal of writings. None have been produced to indicate that she was seriously contemplating or planning her suicide. If this were a planned suicide, it is very likely that her writings would substantiate that plan.
d. She was intensely devoted and attached to her dogs. She would not have readily abandoned them. In fact, when she expressed ideation to William Hewett some five (5) days earlier, she expressly asked, as part of that communication, that he come and get her dogs.
e. There is no evidence for advanced planning of her suicide. As is noted below, her method, if suicidal, is not at all characteristic of an impulsive suicide; rather, it would have taken planning. In addition, were she to have meant to disguise her suicide (for which no motive has been offered), planning would have been in evidence. Concurrently, she was not seen as an impulsive person.
f. All observers who saw or spoke with her on the day of her death noted that her mood was upbeat and that her behavior and demeanor exhibited nothing out of the ordinary. She ate dinner less than two (2) hours before her death. In addition, on the evening of her death she had expressed concern for her friend Laura's health, an unlikely focus if she were thinking of and planning to kill herself.
g. She was not drinking on the night of her death; and, if her death were to be an impulsive suicide, it would have been much more likely to have occurred when she was under the influence of alcohol two (2) days before while upset about the breakup of her relationship. But, again, if her death were to be a suicide, it would more likely have been planned. There is no evidence of planning behavior in this case.
h. She was actively looking for a new job.
i. At the site of her death, her truck was left on and her flashlight was still in the cab. There would be no need to leave her truck on if she were intent on killing herself and, as has been observed, she typically took her flashlight with her at night.
j. Her body was found facedown, but there was no evidence of bruising noted, indicating that she did not fall to the ground after wounding herself. This would imply that, if this were suicide, she killed herself while lying facedown on the ground. This is not typical of gunshot wound suicides, nor would it be typical of a suicide decided on impulse.
k. The most compelling evidence against suicide is her method used to accomplish her death. To self-inflict a gunshot wound to the posterior mid line of her head and accomplish a slight upwards trajectory, she would have had to have aimed the gun at the front of her face with her thumb on the trigger, then raised her arms over her head so that the gun would be in the mid line and upside down. In this position the Glock would have ejected the casing to the left. The casing was found to the right of her body. Moreover Decedent's arms would have to be long enough to accomplish this sufficient to have her hands below the barrel of the gun in order to get an upward trajectory of the bullet. This is a most unlikely scenario. Recreation by Dr. Berman of the above scenario included three women, all taller than Davina Jones, and consequently of probable greater arm length, holding a ruler with what he has been told by a contact with the Washington, DC, police department would be the estimated length of a 40-caliber Glock (approximately 7.5 inches). None of the women could come at all close to that trajectory. All three women could only accomplish a downward pointed angle of entry. A mid-line entry wound with an ascending pathway does not appear to have been physically possible for a woman of Decedent's size and arm length to accomplish with her service weapon.
l. Furthermore, the location of the entry wound is very rare, in general, and much more characteristic of homicide, when it occurs. For example in the study of firearm wounds to the head entitled Multifactorial Analysis of Firearm Wounds to the Head with Attention to Anatomic Location appearing in the American Journal of Forensic Medicine and Pathology, 20(2): 109-115 (1999) by S. J. Cina, M. Ward, M. A. Hopkins and C. A. Nichols, the back of the head was noted rarely to be an entrance site in general for a firearm death, and when it did occur, it was six (6) times more prevalent in deaths ruled homicide versus suicide. In fact, in that study only one (1) of eighty-six (86) suicides by firearm cases had a back of the head entry wound. In an earlier study entitled Sites of Suicidal Gunshot Wounds. Journal of Forensic Sciences, 26(3), 480-485 (1981) by J. W. Eisele, D. T. Reay and A. Crook, only one (1) of one hundred seventy-five (175) self-inflicted gunshot wounds to the head or neck were sited at the back of the head.
m. If one were to posit a motive for her death as anguish, and possibly rage, or the end of a relationship, Dr. Berman would expect that Decedent would have (a) written a note to that effect (as she allegedly wrote much of her thoughts and feelings) or (b) completed suicide figuratively or literally on his doorstep. She neither left such communication nor was she found in a location more directly tied to their relationship.
40. The crime scene was annihilated when it was hosed down, making the drag marks between the pool of blood and the vehicle unexamined, as well as any possible blood spatter analysis impossible.
41. As the body was left uncovered and the hands and feet were not bagged or otherwise protected, trace evidence was unable to be examined.
42. The integrity of the crime scene was compromised, which made any determination as to body placement, weapon trajectory and analysis of the scene highly speculative.
43. While defendant asserts that decedent's death was a suicide, the Full Commission is unable to make that conclusion as the investigation into a possible homicide was not conducted to its fullest potential. The evidence indicates that decedent communicated via radio that she was in the presence of three subjects, and included a transmission in which she indicated that one of the subjects was in possession of a gun.
44. The Full Commission finds as fact that although decedent had prior suicidal thoughts, the greater weight of the evidence shows that decedent was not suicidal at the time of her death.
45. The greater weight of the evidence shows that it is highly unlikely that decedent would be able to position her pistol in a manner to achieve the trajectory of the bullet which caused her death.
46. Based upon the greater weight of the evidence, decedent was a law enforcement officer killed in the line of duty. Her death resulted from bodily injuries sustained while in discharge of her official duties.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On October 22, 1999, decedent was employed as a law-enforcement officer with the Village of Bald Head Island and sustained a hard contact gunshot wound to the back of the head which was the cause of her death. At the time of her death decedent was a police officer employed by the Village of Bald Head Island killed in the discharge of her official duties and covered by the provision of N.C. Gen. Stat. § 143-166.1, et seq.
2. Decedent was not survived by a spouse nor any children nor any dependent parent, therefore, the estate of the Decedent is entitled to be paid fifty thousand dollars ($50,000.00), pursuant to N.C. Gen. Stat. §143-166.3.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. The sum of fifty thousand dollars ($50,000.00) shall be paid to the estate of Davina Buff Jones.
2. An attorney fee in the amount of twenty-five percent (25%) of the compensation due to the estate of Davina Buff Jones is hereby approved for plaintiff's counsel.
3. Defendant shall reimburse plaintiff for all costs and expenses incurred in obtaining the depositions of witness and all expert witness fees.
This the 3rd day of May, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER